Cheshire,
No. 5765.

### FRANCIS RATTI

*v.*

### HINSDALE RACEWAY & *a.*

Argued November 6, 1968.
Decided January 31, 1969.

*Faulkner, Plaut, Hanna & Zimmerman* and *Stillman D. Rogers* (*Mr. Rogers* orally), for the plaintiff.

*John M. Reynolds* for Hinsdale Raceway and *George S. Pappagianis,* Attorney General and *Norman E. D'Amours,* Assistant Attorney General (*Mr. D'Amours* orally), for the defendant New Hampshire Racing Commission.

PER CURIAM. Plaintiff, a resident of Vermont, in a petition for declaratory judgment (RSA 491:22) seeks a determination that the statute (RSA 284:3) which compels a licensed race track to employ at least eighty-five per cent of its employees from New Hampshire residents is discriminatory and unconstitutional. Research has not disclosed that the factual situation of this case has been litigated in any other jurisdiction. The statute reads as follows: "EMPLOYEES. At least eighty-five per cent of the persons employed by a person, association, or corporation conducting a racing plant under the provisions hereof shall have resided in this state for a period of not less than one year. The provisions of this section shall not apply to the construction of a racing plant or its equipment."

The facts are not in dispute. The plaintiff, a nonresident, was employed by the defendant, Hinsdale Raceway as "a counter in the money room" and was dismissed because, and only because, the defendant was attempting to comply with the requirements of RSA 284:3. The dismissal was caused by the defendant, New Hampshire Racing Commission, which required defendant race track to enforce and comply with the provisions of RSA 284:3, limiting nonresident employees to fifteen per cent of the total employees. The Court (*Dunfey*, J. ) reserved and transferred without ruling the questions of law raised by the petition and the undisputed facts.

The right of a citizen in one state to travel freely and to seek employment in another state is guaranteed by both the State and Federal Constitutions. *State* v. *Pennoyer*, 65 N. H. 113; *Edwards* v. *California*, 314 U. S. 160; *Toomer* v. *Witsell*, 334 U. S. 385. The "right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [14th] Amendment to secure." *Truax* v. *Raich*, 239 U. S. 33, 41. In this jurisdiction, statutory discrimination in employment based solely on nonresidence has been frequently condemned and invalidated. *Bliss's Petition*, 63 N. H. 135; *State* v. *Lancaster*, 63 N. H. 267; *State* v. *Moore*, 91 N. H. 16; *Studio* v. *Portsmouth*, 95 N. H. 171.

On the other hand, discrimination in employment, even in the "common occupations," against citizens of other states "in the many situations where there are perfectly valid independent reasons for it" other than the mere fact of nonresidence, is not

barred by constitutional restraints. In considering whether there are valid independent reasons "States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." *Toomer* v. *Witsell,* 334 U. S. 385, 396. A person seeking to have such a statute declared invalid has the burden of proving the absence of any conceivable ground upon which the statute may be supported. *Landers* v. *Eastern Racing Assoc.,* 327 Mass. 32; *Chronical &c. Pub. Co.* v. *Attorney General,* 94 N. H. 148. See *McLaughlin* v. *Florida,* 379 U. S. 184, 191.

In determining whether there are valid independent grounds for upholding the statute in question, we should bear in mind that it applies only at race tracks where pari-mutuel betting is carried on under a license from the State and does not bar nonresidents from all occupations, as was the case in *Truax* v. *Raich, supra.* Conducting pari-mutuel horse races is an activity which prior to the enactment of RSA ch. 284 was a prohibited unlawful undertaking. It is a privilege such as the State may grant or withhold at pleasure. *North Hampton &c. Assn.* v. *Commission,* 94 N. H. 156, 159. Such activity "presents a social problem properly coming under the exercise and jurisdiction of the police power of the State and which requires strict regulation and supervision." *Id.* 159. It is important to note that we are dealing here with an activity which the State may prohibit altogether, not one which it may merely regulate.

The State could operate the tracks and the pari-mutuel betting machinery itself as it has in the case of spiritous liquor (RSA ch. 177) and the Sweepstakes (RSA 284:21 a-g) or it can conduct operation through licenses, as it chose to do in the case of pari-mutuel race tracks. Whichever way the track is operated, the purpose is to raise revenue and at the same time to control the operation to guard against whatever social evils may be involved. *North Hampton &c. Assn.* v. *Commission, supra.*

The State argues that the purpose of the statute is to "prevent inordinate out-of-state influence upon a sport particularly vulnerable to abuse and misuse." It is a matter of common knowledge that, because licensees are limited in their operations to a certain number of days each year, employment at pari-mutuel race tracks in this State is for limited periods of time only. If there were no restrictions against nonresidents being employed at the tracks, there would be the danger that the employees would be preponderantly from out of state who would travel from track

to track, and would include a large segment of the gambling or otherwise undesirable element. *North Hampton &c. Assn.* v. *Commission, supra,* 161.

The social evils associated with gambling to which employees may contribute are not necessarily related to the type of work performed. These problems are subject to more control if a large percentage of the employees, whatever their work entails, have resided in New Hampshire for one year prior to employment. Such residence gives promise that they will still be here and subject to the State's process after the meet has ended.

The necessity for such restrictions in relation to pari-mutuel race tracks is recognized by other states which have enacted similar legislation. 8 Maine Rev. St. Anno. *s.* 339; 31 Vt. Stat. Anno. *s.* 615 (supp); 128 A. Mass. Gen. Laws Anno. *s.* 10; 5:5 N. J. Stat. Anno. 36; Fla. Stat. ch. 550.27; N. Y. Unconsol. Laws *s.* 7973 (McKinney 1961).

We hold that this regulation is valid as it protects a social interest endangered by activity in the regulated area and the means adopted are in fact suited to the protection of that interest. *Manchester Press Club* v. *Commission,* 89 N. H. 442; *Carling Brewing Co.* v. *State Liquor Commission,* 102 N. H. 284.

*Remanded.*

KENISON, C. J.,   dissented.

KENISON, C. J.,   *dissenting*: The statute (RSA 284:3), which is the sole cause of the plaintiff's dismissal from his employment, is based on residence alone and the competence, skill or integrity of the employee is immaterial. Certainly we are not justified in taking judicial notice that the probity and stability of the plaintiff and other Vermont employees are inferior to that of New Hampshire employees. The presumption of constitutionality to which the statute is entitled (*Chronicle &c. Pub. Co.* v. *Attorney General,* 94 N. H. 148), will not give it a protective veneer of rationality, if it is pock-marked by invalid discrimination. *State* v. *Moore,* 91 N. H. 16. The statute does not meet the test of equality as it has been understood and developed in this state. *State* v. *Pennoyer,* 65 N. H. 113; *State* v. *Moore, supra.* I am in full accord with the law and authorities cited in the third paragraph of the court's opinion and regret that it has failed

to follow and apply them to this case.

Implicit in the majority opinion are cases which limit employment on State construction to residents such as *Heim* v. *McCall*, 239 U. S. 175 and *Crane* v. *New York*, 239 U. S. 195 decided in 1915. As constitutional currency these cases have had a declining value ever since one year from their birth when they were subjected to critical analysis in Powell, The Right to Work for the State, 16 Colum. L. Rev. 99 (1916). "It is now axiomatic that the equal protection clause is as fully applicable to public benefits and public employment as to other actions of a state. But it was not always so. The clause had been part of the Constitution for seventy years before the Supreme Court wholly repudiated [*Missouri ex rel. Gaines* v. *Canada*, 305 U. S. 337 (1938)] the notion that a state's power to withhold from all carried with it, to some undefined extent, a special license to withhold from one group while granting to another." Willcox, Invasions of the First Amendment Through Conditioned Public Spending, 41 Cornell L. Q. 12, 15 (1955).

It is argued that racing and gambling is subject to abuse and therefore can be prohibited or strictly regulated under the police power. This argument may be readily conceded but it does not follow that the power to prohibit or regulate encompasses the right to do it by discriminatory methods. Note, Unconstitutional Conditions, 73 Harv. L. Rev. 1595 (1960). There is a certain surface logic to the proposition that if gambling and horse racing is a privilege, the State may attach such conditions to the privilege as it chooses. But the proposition is fallacious and it proves too much, as has been convincingly demonstrated in Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L. Rev. 1439 (1968).

Emphasis in the court's opinion has been placed on the social evils and the social problems connected with race tracks and gambling. A flint-eyed realist would recall what this court said in *North Hampton &c. Assn.* v. *Commission*, 94 N. H. 156, 162: "It is a matter of common knowledge of which we can take judicial notice that the strongest . . . motivating factor in favor of and which brought about the enactment of the law originally was the promise of substantial revenue that the State would derive from the granting of the privilege to conduct pari-mutuel racing." See Hoffheimer, Some Horse Racing Tips for Lawyers,

50 A.B.A.J. 250 (1964). I cannot believe that the benign quota of 15% nonresidents tolerated by the statute (RSA 284:3) is relevant, necessary or constitutional in 1969. It is ironic that discrimination which is prohibited by statute and judicial decision in most other areas should be retained on the tenuous basis of non-residence. I conclude the statute is discriminatory and invalid.